HORAN *v.* HORAN.

1. DIVORCE—EXTREME CRUELTY.
   Where husband used violent and abusive language toward wife, calling her opprobrious names, wife is entitled to divorce on grounds of extreme cruelty.

2. SAME—PUBLISHING HUSBAND'S CONDITION.
   That wife told aunt, the only person to whom she could go, that husband had venereal disease, would not of itself entitle husband to divorce.

3. SAME—ALIMONY.
   Award of $1,000 alimony to wife entitled to divorce on grounds of extreme cruelty is insufficient, and, on appeal, amount is increased to $5,000 which is in lieu of all other claims against husband's property, where husband earns $6,000 a year, was well-to-do shortly before his marriage to plaintiff, and still controls large block of stock turned over to minor son prior to said marriage.

Appeal from Allegan; Cross (Orien S.), J. Submitted April 18, 1930. (Docket No. 67, Calendar No. 34,699.) Decided June 2, 1930.

Bill for divorce by Stephanie M. Horan against George H. Horan. Defendant filed cross-bill for divorce. From a decree for defendant on his cross-bill, plaintiff appeals. Reversed, and decree granted plaintiff.

*Leo W. Hoffman* and *Clare E. Hoffman,* for plaintiff.

---

* Continued from Vol. 250.

Communication of venereal disease as cruelty entitling wife to divorce, see annotation in 5 A. L. R. 1016; 8 A. L. R. 1540.

*Harry Pell*, for defendant.

BUTZEL, J. Plaintiff and appellant, Stephanie M. Horan, at the age of 28, on the 11th day of February, 1928, married defendant and appellee, George H. Horan, then 45 years old, in the city of Chicago. She had previously worked continuously for nine years in a secretarial capacity in the Chicago office of a large manufacturer. Defendant was a prominent merchant of Allegan, Michigan, where he was in charge of a corporation that conducted a large retail store there. The business had been in defendant's family for many years. He drew a salary of $100 a week, and in addition thereto received an annual bonus of $1,000. Defendant had been the owner of a large block of stock in the corporation, but according to his claim he had transferred this stock shortly before he met plaintiff to his nine-year old son by a previous marriage.

After spending a honeymoon of some five weeks traveling in California, the parties settled down in Allegan, Michigan, in a rented house which was well furnished by defendant. A year prior to her marriage, plaintiff had not been well and had been attended by a Dr. Nienow of Chicago, a graduate of Rush Medical College, who was teaching surgery at Northwestern University and was head of its surgical anatomy department, and who was on the staff of the Western Memorial Hospital and surgeon for the Corn Products Refining Co. Plaintiff was suffering from some bronchial trouble, and at that time was examined by Dr. Nienow in order to determine the cause of her sickness. Dr. Nienow testified that he made a very thorough examination of plaintiff, looking particularly for any focal infection, and, in

accordance with modern practice, made an investigation to ascertain the presence of any venereal disease. He found no traces of any. He ordered her to take a rest. She went to Allegan, Michigan, where she first met defendant, to whom she became engaged. After she had fully recovered her health she returned to Chicago, took up her old position, and shortly thereafter married defendant.

During the honeymoon, a contraceptive was used by defendant, but, according to his testimony, abandoned upon his return to Allegan. Shortly thereafter it appeared that he had a very severe case of gonorrhea. He first claimed he had been infected by a toilet seat, but later told plaintiff that he was suffering from a recurrence of an old infection brought about by his lifting some heavy object. Plaintiff remained loyal to him and did all she could to help him. The parties went to Chicago to consult Dr. Nienow, who found defendant was suffering from the disease, but found plaintiff then free from it. Immediately after finding out he had the disease, defendant also went with plaintiff to a specialist in Grand Rapids, who pronounced plaintiff free from the disease, but treated defendant for it. The parties also consulted Dr. Stuch, an experienced physician of Allegan. He also found plaintiff free from the disease. Defendant admitted that he had had the disease some 25 years ago, prior to his first marriage, but stated that he had been completely cured and became a father since then. Defendant told another witness that his old trouble had come back through "jazzing too much and drinking too much for his own good." According to plaintiff, after six months no contraceptive was used, and shortly thereafter plaintiff began to suffer in the abdominal region, and later it was discovered she had an in-

fection in the Fallopian tubes, which seemed to be gonorrheal in its origin.

The parties began to quarrel, and on March 23, 1929, plaintiff sued for separate maintenance and support, claiming extreme cruelty and accusing defendant of being responsible for her diseased condition. Subsequently, in an amended bill, she asked for an absolute divorce. Defendant denied the charges, and in a cross-bill claimed that plaintiff had published the charge that he was guilty of giving her the disease, and asked for an absolute divorce. A Dr. Van Ess of Allegan who had treated members of defendant's family, was permitted to examine plaintiff during the course of the hearing. He found the inflammation for which gonorrhea is one of the recognized causes. It was his belief, however, that it came from an old infection, and that she was suffering from a chronic condition, but refused to state how old it was. The doctors in the case, as well as the medical authorities, are in accord in the statement that it is impossible to tell when the specific germs causing the disease permanently lose their virility or are absolutely expelled from the system. The germs may become walled in the genitourinary tract and the disease become latent, only to break out again at a later period. How long a time may elapse before the disease breaks out again in virulent form is uncertain, but cases where this has happened after a lapse of 25 years are unknown. The testimony seems to prove quite definitely that plaintiff was free from the disease at the time of her marriage. The testimony of the physicians, while certain as to certain known facts about the disease, was equally uncertain in regard to others. The court tried to find a less disagreeable and more

certain reason for granting a divorce. When plaintiff left her husband, of her own accord according to defendant, and according to plaintiff, because she was forced to do so, she went to her aunt and told her of the difficulty. The story in this or some other manner became known, and defendant's fellow-townsmen knew that plaintiff accused defendant of being responsible for her trouble. The circuit judge held that in making the statement to her aunt, and the subsequent publication of it, plaintiff was guilty of extreme cruelty to defendant, and that defendant was entitled to a divorce on his cross-bill. He awarded plaintiff as alimony the sum of $1,000. A careful reading of the record impresses us that the decree should be set aside and plaintiff should be given the divorce and a more adequate sum for alimony. There is no hope of reconciliation, as the feeling of mutual love and respect seems to be hopelessly gone. According to the testimony of the maid who worked for the parties, defendant used violent and abusive language towards plaintiff, calling her opprobrious names. This with the other facts in the case is sufficient to entitle plaintiff to a divorce. Defendant in his own testimony does not accuse plaintiff of having published charges against him, and the fact that plaintiff told her aunt—the only person to whom she could go—would not of itself entitle defendant to a divorce.

We believe, therefore, that plaintiff should be granted a divorce on the grounds of extreme cruelty. We further believe that the sum of $1,000 as alimony is wholly insufficient. It is true that whatever property defendant had at the time of the marriage was accumulated without any contribution by plaintiff, and she added nothing to it. She was married to defendant only a little over a year. She returned

to her home in poor physical condition. Defendant was well-to-do shortly prior to his marriage. From the meagre evidence in the case, it would appear that notwithstanding the fact that defendant had turned his stock over to his minor son shortly before his marriage to plaintiff, nevertheless this was done, according to the testimony, before he had met plaintiff. It might have been done for the boy's protection rather than in contemplation of placing it beyond the reach of his wife should he remarry. Defendant, however, continued to use the stock as his own. He put it up as collateral for his personal loan and collected the dividends on it. This indicates that he still retained his ownership therein. Whether he did or not, he earned a salary of $6,000 a year, and had some other property against which he owed considerable money. We believe that plaintiff should receive as alimony the sum of $5,000, payable $1,000 within 30 days after the entry of this decree, and $1,000 a year, without interest except on overdue instalments, each year thereafter during the next succeeding four years; and that in the event of the death of defendant prior thereto, any unpaid balance shall be a charge against his estate. This award shall be in lieu of all other claims against defendant's property, except that plaintiff shall retain such household furniture as has already been turned over or awarded to her. Plaintiff will recover costs.

WIEST, C. J., and CLARK, MCDONALD, POTTER, SHARPE, NORTH, and FEAD, JJ., concurred.